# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | |
|---|---|
| THERESA WESTBROOK, | ) |
|    *Plaintiff*, | ) Case No. 1:23-cv-216 |
| v. | ) Judge Travis R. McDonough |
| | ) Magistrate Judge Christopher H. Steger |
| CHATTANOOGA HAMILTON COUNTY HOSPITAL AUTHORITY d/b/a ERLANGER HEALTH SYSTEM and ERLANGER HEALTH, | ) |
|    *Defendants*. | ) |

## MEMORANDUM OPINION

Before the Court is Defendants Chattanooga Hamilton County Hospital Authority d/b/a Erlanger Health System and Erlanger Health's (collectively "Erlanger") motion for summary judgment. (Doc. 20.) For the reasons stated below, Erlanger's motion (*id.*) will be **GRANTED IN PART** and **DENIED IN PART**.

### I. BACKGROUND

Plaintiff Theresa Westbrook has worked for Erlanger as a surgical technologist ("surgical tech") since 2007. (Doc. 23-1, at 2.) The role of a surgical tech is to prepare the operating room and assist the surgeon during operations. (*Id.*) Plaintiff previously worked in Erlanger's Main Operating Rooms for over a decade where she assisted with cardiac surgeries. ("Main OR"). (*Id.*; Doc. 21, at 3).) In 2018, the Cardiovascular Operating Rooms ("CVOR") were separated from the Main OR and moved to the fourth floor as part of Erlanger's new "Heart and Lung Institute." (Doc. 23-1, at 4.) Plaintiff moved to the newly established CVOR. (*Id.*)

There are significant differences between the Main OR and the CVOR. In the Main OR surgeries are scheduled "days in advance" whereas in the CVOR "surgeries [are] performed on an emergency basis" or with little notice. (*Id.* at 4.) Additionally, only eight or fewer surgical techs are hired to work in the CVOR at any given time, while there are many surgical techs working in the Main OR. (Doc. 19-1, at 3.) As a result of these differences, CVOR surgical techs are often "on call" when not working, which means that they must be available to come in to work if necessary. (Doc. 23-1, at 4.) Surgical techs who are on call were paid $5/hour and an additional $250 if they were called in to work. (*Id.*) Furthermore, CVOR surgical techs are required to work a "considerable number of overtime hours" and therefore have the potential to earn more than surgical techs in the Main OR. (*Id.*) Finally, unlike the Main OR, the CVOR consists of a total of four operating rooms: three "Traditional Rooms" and one "Hybrid Room." (*Id.*) This Hybrid Room is special in that it contains x-ray equipment and therefore "everyone working in the hybrid room [must] wear a lead jacket." (*Id.* at 4–5.)

Plaintiff currently suffers from two chronic illnesses: Cervical Spine Neuropathy and Primary Biliary Cholangitis. (Doc. 23-1, at 2–3.) Plaintiff was diagnosed with Cervical Spine Neuropathy ("CSN") in 2000. (*Id.* at 2.) CSN causes "unusual amounts of pain and weakness in the arms, back, and shoulders, as well as frequent pain in the neck and head." (*Id.* at 3.) Plaintiff avers that her illness "severely limited her ability to stand, walk, and lift items." (*Id.* at 2–3.) Plaintiff was also diagnosed with Primary Biliary Cholangitis ("PBC") in 2022. (*Id.* at 3.) PBC is a liver disease which exacerbates Plaintiff's fatigue and makes it difficult for her to sleep. (*Id.*) Furthermore, PBC "caused [Plaintiff] to miss work on a sporadic basis," for which she took leave pursuant to the Family and Medical Leave Act ("FMLA"). (*Id.* at 6.) Throughout her time working at Erlanger, "Plaintiff [was] not [] required to work in situations where the lead vest was

required" on account of her CSN. (*Id.* at 4.) Employees with similar medical issues were given the same accommodation. (Doc. 23-1, at 5, 22.)

On December 6, 2021, Plaintiff's doctor, Lisa Brooks, sent Erlanger a note stating that, due to her medical conditions, she was restricted to the "wearing of [a] lead apron to ten pounds for total of 45 minutes per day."[1] (Doc. 19-1, at 28.) On May 13, 2022, Brooks provided another note stating that "[Plaintiff's] exertional capacity is limited and she will require frequent breaks to reduce pain and generalized fatigue which could affect fine motor skills." (*Id.* at 50.) Brooks further noted "the use of weights, such as lead aprons, will exacerbate her symptoms." (*Id.*) Brooks also recommended "allowance for brief breaks of 15-20 min[utes] every 2 hours if needed by [Plaintiff]." (*Id.*) Two days later, on May 17, 2022, Plaintiff submitted a "Request for Reasonable Accommodation" formally requesting "[t]o not wear lead." (*Id.* at 48.) After a sometimes-contentious back-and-forth email exchange between Erlanger's human resources staff and Plaintiff, "the decision was ultimately made [on May 25, 2022] to allow [Plaintiff] to be excused from working in the hybrid room" to accommodate her need to not wear the lead apron. (Doc. 21, at 6.) Erlanger also allowed Plaintiff to use a stool while working to accommodate her need for breaks. (Doc. 19-1, at 59.)

Roughly a month later, on June 24, 2022, Adam Royer took over administration of the CVOR. (*Id.* at 4.) Royer avers that as a part of his new role overseeing the CVOR, he began "review[ing] staffing and operations . . . to ensure that we were operating safely and efficiently." (*Id.*) This included reviewing Erlanger's policy, enacted in 2021, that all CVOR surgical techs be "cross trained" to work in the hybrid room. (Doc. 19-1, at 3, 66.) Erlanger determined that cross training was necessary to "enhance[] scheduling flexibility," to allow additional surgical

---

[1] It is unclear why, if Plaintiff was already being accommodated, she sent this letter to Erlanger.

techs "to assist in the event of an emergency," and "to help reduce employee stress and burnout" due to the intense nature of working in the hybrid room. (*Id.* at 3–4.) Furthermore, because the CVOR had so few surgical techs, Erlanger believed that cross training "enhanced scheduling flexibility and the ability to cover sick or absent co-workers." (*Id.* at 3.)

Dr. Larry Shears is a surgeon who regularly works in the CVOR. (Doc. 23-1, at 6.) Plaintiff avers that Shears was in a romantic relationship with another CVOR surgical tech. (*Id.*) Plaintiff states that she observed this surgical tech drunk both while working and while on call. (*Id.*) Plaintiff also claims that on one occasion Shears allowed this surgical tech to "perform the opening of [a] patient's chest with [a] surgical saw." (*Id.*) Plaintiff reported these incidents to Erlanger, and, after this, "Shears' attitude towards [her] became very negative." (*Id.*) Plaintiff avers that their relationship deteriorated to the point where "[Shears] called [her] a 'bitch' in the operating rooms on numerous occasions," and "he sometimes threw things at [her] during surgeries." (*Id.* at 7.) On July 8, 2022, Plaintiff was scheduled to assist Shears in surgery. (*Id.*) Plaintiff arrived late as a result of taking FMLA leave. (*Id.*) When Shears saw Plaintiff arriving late, he berated her and immediately demanded to speak to Royer. (*Id.*) Royer immediately came to the operating room and afterwards told Plaintiff that they would need to meet. (*Id.*) On July 18, 2022, the two met, and Royer told Plaintiff she was being transferred to the Main OR because she was unable to work in the Hybrid Room. (*Id.*) Royer indicated that he had become "aware of the restriction in place for [Plaintiff] related to her inability to work in the hybrid suite," and he believed that this limitation would "create significant safety concerns for both the patients we serve and [Plaintiff]." (Doc. 19-1, at 7.) Plaintiff told Royer that she believed that she was being transferred because "[Shears] finally got his way" and "she [was] being

punished." (*Id.*) Royer denied that she was being punished and noted that Plaintiff had "expressed interest multiple times about transferring to the [Main] OR." (*Id.*)

Plaintiff was transferred to the Main OR following the meeting. (*Id.* at 5.) Though the pay for a Main OR surgical tech is typically lower than the pay of a CVOR surgical tech, Erlanger made an exception and allowed Plaintiff to keep her same rate of pay. (*Id.* at 12.) However, Plaintiff avers that because of the transfer, she has lost on-call and overtime pay of $56,222.80 over the past two years. (Doc. 23-1, at 8.) Furthermore, Plaintiff has repeatedly applied for her old position in the CVOR but has been denied. (*Id.*) Plaintiff avers that there are several CVOR surgical tech positions that remains unfilled. (*Id.* at 9, 26.)

On August 24, 2024, Plaintiff brought the present action. (Doc. 1.) Plaintiff avers that Erlanger discriminated against her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq* and the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA").[2] (Doc. 1-2, at 6.) Specifically, Plaintiff claims that Erlanger failed to reasonably accommodate her and retaliated against her for using FMLA leave. (*Id.*)

On July 1, 2024, Erlanger moved for summary judgment. (Doc. 20.) Erlanger's motion is now ripe for the Court's review.

---

[2] Plaintiff initially appeared to assert a claim that Erlanger was violating the "public policy of the State of Tennessee." (Doc. 1-2, at 6.) Erlanger construed this as a claim under Tennessee's whistleblower protection law. (Doc. 21, at 17.) However, in response, Plaintiff clarified she was attempting to only assert an FMLA retaliation claim, not a whistleblower claim. (Doc. 23, at 7.) To the extent that Plaintiff attempts to assert a claim under Tennessee law, she has not adequately pled any such claim.

## II. STANDARD OF LAW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

### III.     ANALYSIS

#### A.     ADA Claim

Erlanger argues that Plaintiff's failure-to-accommodate claim fails as a matter of law because: (1) Plaintiff is not disabled; (2) Plaintiff is not a "qualified individual" because she cannot perform the essential functions of her job in the CVOR; and (3) it reasonably accommodated Plaintiff by transferring her to the Main OR. (Doc. 21, at 11–12.)

##### *i.* Disability

Erlanger first claims that "[Plaintiff] has presented no evidence that she is disabled such that one or more of her major life activities are substantially limited." (*Id.* at 12.)

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The ADA defines discrimination to include failing to reasonably accommodate a disabled employee. *Id.* § 12112(b)(5). To establish a prima facie case for a failure-to-accommodate claim, a plaintiff must first show that she is disabled within the meaning of the ADA. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 417 (6th Cir. 2020). The ADA defines "disability" broadly to include: "[1] a physical or mental impairment that substantially limits one or more major life activities of such individual; [2] a record of such an impairment; or [3] being regarded as having such an impairment." *Id.* § 12102(1). The statute provides a non-exhaustive list of "major life activities" which includes "sleeping, walking, [and] standing." *Id.* § 12102(2). Furthermore, "Congress made clear that the definitions of both a 'disabled person' and 'substantially limits' are to be construed broadly in favor of expansive coverage." *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 299 (6th Cir. 2019).

Erlanger argues that Plaintiff has not presented any evidence that she is substantially limited in a major life activity. (Doc. 21, at 12.) However, Plaintiff avers that her spine and liver conditions lead to extreme fatigue and pain which in turn "severely limited her ability to stand

walk, and lift items." (Doc. 23-1, at 2–3.) The ADA explicitly defines standing and walking as "major life activities." 42 U.S.C. § 12102(2). Furthermore, Plaintiff's doctor has stated that as a result of her medical conditions "[Plaintiff's] exertional capacity is limited[,] and she will require frequent breaks . . . of 15-20 min[utes] every 2 hours." (Doc. 19-1, at 50.) Plaintiff has therefore raised a genuine dispute of fact as to whether she is "disabled" within the meaning of the ADA.

    *ii.* **Qualified Individual**

Erlanger next argues that Plaintiff is not a qualified individual under the ADA because Plaintiff is unable to perform the essential functions of a CVOR surgical tech, namely: (1) standing for long periods without breaks; (2) working in the CVOR Hybrid Room; and (3) being available to be on call. (Doc. 21, at 12–14.)

Once a plaintiff establishes that she is disabled, she must then show that she is "otherwise qualified" for her position despite her disability either: (a) without accommodation from her employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation. *Fisher*, 951 F.3d at 417. If an employee "challenge[s] [a] job criterion as unessential" and asks that it be eliminated, then "the burden [is] on the defendant[] to demonstrate that this criterion is in fact a fundamental job duty." *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 726 (6th Cir. 2000); *see also Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020) (noting that the burden is on the defendant to prove "that a challenged job criterion is essential, and therefore a business necessity.") (citation and internal quotations omitted).

"A job function is essential if its removal would fundamentally alter the position." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018) (quoting *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 833 F.3d 595, 603 (6th Cir. 2018)). The Sixth Circuit has noted that the determination of whether a job function is essential must be evaluated on a case-

8

by-case basis and is "highly fact specific." *Id.* (citation and internal quotations omitted). As a result, this determination is "typically not suitable for resolution on a motion for summary judgment." *Keith v. Cnty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013) (citing *Kiphart v. Saturn Corp.*, 251 F.3d 573, 585 (6th Cir. 2001)). EEOC regulations lay out a non-exhaustive list of seven factors for courts to use evaluate whether a job function is essential:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3). In addition to these factors, the Sixth Circuit has noted that a factfinder should rely upon its own "common sense" to determine whether a job requirement is essential. *See E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 762 (6th Cir. 2015).

Here, Plaintiff claims that she was qualified to work in the CVOR with: (1) the reasonable accommodation of a stool, and (2) with the requirement of working in the Hybrid Room eliminated. (Doc. 23, at 4.) However, Erlanger argues that "being able to stand for a prolonged period of time for procedures without breaks" and "working in the hybrid room" are both essential functions of the position which Plaintiff could not perform. (Doc. 21, at 11–12.)

Erlanger argues that standing for prolonged periods without a break is an essential function of the CVOR surgical tech position. (*Id.* at 11–12.) Erlanger points out that the job description notes that an employee could be required to stand for "67–100% of the work shift."[3]

---

[3] Erlanger suggests that Plaintiff's requested accommodation was that she be allowed to leave the surgical procedure and take breaks as needed. (Doc. 21, at 5.) However, Plaintiff states that she only requesting the ability to sit down at times during surgeries, not to leave the operating room

(Doc. 19-1, at 10.)  However, the job description also states that a surgical tech could sit "occasionally" for up to 33% of a work shift.  (Doc. 19-1, at 18.)  Given Plaintiff's doctor's recommendation that she take breaks only "if needed," it is entirely possible that Plaintiff could perform the essential function of standing for at least part of a surgery.  (*Id.* at 50.)  Furthermore, the fact that Erlanger determined in May 2022 that a stool was a reasonable accommodation undercuts its position that standing for the entire surgery is essential.  (*Id.* at 59.)  In fact, Erlanger was accommodating multiple employees in this way.  (*See id.* (Erlanger staff noting that "[t]he accommodation for a stool would be fine because we are already doing that for a current scrub tech.").)  Courtney Ayres, the Director of Heart and Lung Institute Perioperative Services, and Cardiothoracic Surgery, states that Erlanger's determination at the time was wrong because "a Surgical Tech would not be able to safely use a stool in whole or in part during the course of the vast majority of surgical procedures in the CV OR."  (Doc. 24-1, at 213.)  However, Ayres does not say that a surgical tech would never be able to safely sit down, nor does she explain what safety risks a stool would pose.  (*See id.*)

      Erlanger next argues that working in the Hybrid room is an essential function of the CVOR surgical tech position.  Erlanger noted that it has been its policy since 2019 that all CVOR surgical techs be "cross trained" to work in the hybrid room.  (Doc. 19-1, at 3, 66.)  Erlanger determined that requiring all surgical techs to work in the Hybrid Room was necessary to "enhance[] scheduling flexibility," allow additional surgical techs "to assist in the event of an emergency," and "to help reduce employee stress and burnout" due to the intense nature of working in the hybrid room.  (Doc. 19-1, at 3–4.)  This weighs in favor of finding that working

---

and rest.  (Doc. 23-1, at 8.)  Emails between Plaintiff and Erlanger staff confirm that Plaintiff believed her need for breaks could be accommodated by using a stool. (Doc. 19-1, at 53.)

in the Hybrid Room is an essential function. *See* 29 C.F.R. § 1630.2(n)(3) (noting that courts should consider "[t]he employer's judgment as to which functions are essential" and "[t]he consequences of not requiring the incumbent to perform the function"). However, Plaintiff claims that "the [CVOR] surgical techs do not use the Hybrid Room" anymore. (Doc. 23-1, at 9.) Connie Parker, the "Lead Tech" in the CVOR, similarly states that she has "observed that in the past one and one-half years, the surgical techs . . . from the cardiovascular section of the floor do not work in the hybrid rooms." (*Id.* at 25.) A function that an employee does not perform cannot possibly be "essential."[4]

Finally, Erlanger argues that "surgical techs are required to take call, and the call at any time could require a procedure in the hybrid room." (Doc. 21, at 14.) For the reasons stated above, there is a dispute of whether surgical techs would be called in to help with a procedure in the Hybrid Room. Erlanger also argues that "[Plaintiff] could not safely take call in the traditional CV OR rooms because of her stated need for breaks as needed and the lack of a guaranteed replacement while on call." (*Id.*) Again, Erlanger's contention turns on a dispute of material fact: whether Plaintiff could be reasonably accommodated with a stool. Moreover, Erlanger acknowledges that "[Plaintiff] may be assigned to some on-call work in the Main OR." (Doc. 24, at 8–9.) The fact that Plaintiff can be on call in the Main OR suggests that she could safely be on call in the CVOR as well.

Because there is a question of material fact as to whether Plaintiff is a qualified individual under the ADA, summary judgment is not appropriate.

---

[4] Erlanger disputes this. Ayres states the surgical techs "are and have been required to work in the hybrid room." (Doc. 24-1, at 213.) Ayres further claims that "[i]n 2023 alone, and with respect to just one type of procedure . . . four separate Surgical Techs in the CV OR have worked on a combined 14 such procedures in the hybrid room." (*Id.*) This is a dispute of fact that the Court may not resolve at the summary-judgment phase.

### *iii.* **Reasonable Accommodation**

Erlanger next argues that even if Plaintiff is a qualified individual under the ADA, it reasonably accommodated her by transferring her to the Main OR. (Doc. 21, at 14–16.)

The ADA provides that reasonable accommodations may include:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). The plaintiff "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007) (citation and internal quotations omitted). However, even if a plaintiff has proposed a reasonable accommodation, an employer is not required to accept it if there is more than one way to accommodate her. EEOC guidance states that "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." 29 C.F.R. § Pt. 1630, App., at § 1630.9; *see also Hankins v. The Gap, Inc.*, 84 F.3d 797, 800–01 (6th Cir. 1996) (noting that "an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided.").

Transfer to another position, even a lower-paid, less desirable position can, in certain circumstances, constitute a reasonable accommodation. *See Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998) ("An employer may reassign an employee to a lower grade and paid position if the employee cannot be accommodated in the current position and a comparable position is not available."). However, EEOC guidance provides that an employee may transfer an individual to a lower paying position as accommodation only "if there are no accommodations

12

that would enable the employee to remain in the current position." 29 C.F.R. § Pt. 1630, App., at § 1630.2(o). Put simply, if a reasonable accommodation would allow an employee to stay in her current position, an employer does not have the discretion to choose to transfer her to a lower-paying position. *See Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 286 (3d Cir. 2001) ("If the jury were to find that the bucket truck was a reasonable accommodation [which would allow the plaintiff to stay in his current job], the reassignment to the warehouse position did not satisfy the requirements of the ADA.").

Erlanger argues that transfer to the Main OR was a reasonable accommodation, so it was acting within its discretion to choose to transfer her rather than accept her preferred accommodations. Erlanger further argues that the transfer does not constitute a demotion because "[Plaintiff] remained a Surgical Tech, her hourly rate of pay remained the same, and her terms and conditions of employment were not changed in a material way." (Doc. 21, at 19.) However, Plaintiff claims that because she could earn less on-call pay and had less of an opportunity to work overtime, she lost $56,222.90 in income over the past two years. (Doc. 23-1, at 8.) Plaintiff also claims that she lost her 401k benefits. (*Id.*) In light of these facts, Erlanger's accommodation of Plaintiff could reasonably be considered a transfer to a lower-paying position, which Erlanger was not permitted to do if it could have accommodated Plaintiff in the CVOR.[5] *Cassidy*, 138 F.3d at 634. As noted above, there is a question of material fact as

---

[5] Erlanger acknowledges that in the CVOR a surgical tech in theory can earn more overtime and on-call pay. However, Erlanger argues that the facts show that Plaintiff would not have been available for on-call work or overtime given her physical limitations. (Doc. 24, at 8.) Indeed, Erlanger provides a log of the FMLA leave Plaintiff took in 2023 showing that she missed seventy-one partial or whole days of work. (Doc. 19-1, at 73–79.) However, it is not clear, based solely off this log, that Plaintiff would have been unable to work some amount of overtime or be on call for come period of time in 2023. This genuine dispute of material fact is not appropriate for summary judgment.

to whether Plaintiff could have been reasonably accommodated in the CVOR and therefore summary judgment is not appropriate on this basis.[6]

## B. FMLA Retaliation Claim

Erlanger argues that Plaintiff's FMLA retaliation claim fails as a matter of law because Plaintiff cannot establish a causal connection between her use of FMLA leave and the adverse action. (Doc. 21, at 19–20.)

The FMLA provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). To establish a prima facia case of retaliation under the FMLA a plaintiff must establish by a preponderance of the evidence: "(1) that she engaged in an activity protected by the FMLA; (2) that the defendant knew of this exercise of her protected rights; (3) that defendant thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Crawford v. JP Morgan Chase & Co.*, 531 F. App'x 622, 626–27 (6th Cir. 2013) (citing *Arban v. W. Pub. Corp.*, 345 F.3d 390, 404 (6th Cir.2003).

The Sixth Circuit has held that "a plaintiff can satisfy the [causation] prong based solely on the temporal proximity" but only in "rare cases." *Gammons v. Adroit Med. Sys., Inc.*, 91 F.4th 820, 827 (6th Cir. 2024) (citations omitted). This rule "allow[s] an employee to recover against an employer who unlawfully retaliates swiftly and immediately upon learning of

---

[6] Erlanger also argues that Plaintiff has not carried her burden of proposing a reasonable accommodation because excusing her from working in the Hybrid OR would require her coworkers to cover her procedures in the Hybrid Room. (Doc. 21, at 14–15.) Erlanger claims that such an accommodation is unreasonable as a matter of law. (*Id.* at 15.) However, because of the dispute of fact as to whether surgical techs still work in the Hybrid Room, the Court cannot resolve this argument on summary judgment.

protected activity." (*Id.* (citations and internal quotations omitted).)  However, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality."  *Williams v. Zurz*, 503 F. App'x 367, 373 (6th Cir. 2012) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

Here, Plaintiff's theory of causation rests solely on temporal proximity.  Plaintiff avers that on the morning of July 8, 2022, she took two hours of FMLA leave which resulted in her arriving late for work.  (Doc. 23-1, at 7.)  She further avers that when Dr. Shears saw her arrive, he berated her and demanded to speak to Adam Royer, the Director of Surgical Services.  (*Id.*)  Plaintiff left the operating room, and Royer arrived to talk to Shears.  (*Id.*)  Plaintiff does not claim to know what the two discussed, only that afterwards Royer told Plaintiff they would need to meet.  (*Id.*)  Ten days later, Royer transferred Plaintiff to the Main OR.  (*Id.*)

There are several issues with Plaintiff's theory.  First, and most importantly, Erlanger knew that Plaintiff was taking FMLA leave by December 6, 2021, at the latest.[7]  (Doc. 19-1, at 13.)  However, Erlanger did not transfer Plaintiff until July 18, 2022.  Taking a new period of intermediate FMLA leave does not reset the clock on temporal proximity; time is measured from the first time Erlanger learned that Plaintiff was exercising her right to intermittent leave under the FMLA.[8]  *See McMasters v. Hendrickson USA, LLC*, No. 3:14-CV-329, 2016 WL 5796908, at

---

[7] It is unclear precisely what date Plaintiff first took FMLA leave or when she first told Erlanger that she planned to start taking FMLA leave.  However, Plaintiff filed a complaint with Human Resources on December 6, 2021, stating that she was being retaliated against for taking FMLA leave.  (Doc. 19-1, at 13.)  Therefore, it is safe to say that Erlanger knew no later than December 6, 2021.

[8] This is in line with the logic of allowing temporal proximity alone to satisfy the causation prong.  The Sixth Circuit has recognized that "if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple

*5 (W.D. Ky. Sept. 30, 2016) ("The yardstick for retaliation for the exercise of FMLA rights is the time between [a defendant] learning of [a plaintiff's] exercise of FMLA rights and the purported retaliatory act in response."). Therefore, the time between Erlanger learning of Plaintiff's use of FMLA leave and the alleged retaliation is more than eight months, not ten days. This is simply too long a gap for temporal proximity alone to satisfy the causation prong. *Compare Mickey*, 516 F.3d at 525 (finding temporal proximity alone satisfied causation when an employer fired an employee "the very day" it learned of his EEOC charge) *with Mallory v. Noble Corr. Inst.*, 45 F. App'x 463, 473 (6th Cir. 2002) (finding that "temporal proximity [] should not suffice" when six months had passed between an employer learning of an EEOC charge and the alleged retaliation).

Second, even if the July 8 incident could reset the clock, Plaintiff does not aver that Shears knew that she was taking FMLA when he saw her arriving late. Plaintiff only states that when Shears saw her arriving late "[he] immediately became very angry when he saw me [and] [h]e angrily ordered me out of the operating room because I was late." (Doc. 23-1, at 7.) Plaintiff does not state that she, or anyone else, ever told Shears that she was using FMLA leave that morning. (*See id.*) Therefore, Plaintiff has not even alleged that Shears knew of her protected activity.

Finally, Plaintiff argues that Shears had Plaintiff transferred due to their ongoing personal feud, not her use of FMLA leave. (Doc. 23, at 15–16.) Plaintiff avers that she and Shears had many run-ins, for instance when Plaintiff reported Shears' girlfriend for being drunk or when

---

temporal proximity with any such other evidence of retaliation because the two actions happened consecutively." *Mickey*, 516 F.3d at 525. In cases such as this, when an employer has known of an employee's protected activity for a long time, the employee will have more time to gather facts which would demonstrate causation. *Id.*

Plaintiff reported Shears for allowing his girlfriend to open a patient's chest. (Doc. 23-1, at 6.) Plaintiff even acknowledges that "Shears could (also) have been motivated by animus against Plaintiff for her reporting Shears' girlfriend, him, or both of them, or even the girlfriend's complaints about having to work in the hybrid room."[9] (Doc. 23, at 15–16.) Plaintiff goes on to argue that Erlanger transferred her "solely to satisfy a rogue surgeon who produced lots of revenue." (*Id.* at 16; *see also* Doc. 19-1, at 7 (Plaintiff stating that she was being transferred because "[Shears] finally got his way".)) In Plaintiff's own words, Erlanger did not retaliate against her because of her use of FMLA leave, but simply to make Shears happy. While transferring an employee over a personal feud could be considered unprofessional, it is not unlawful.

Plaintiff has not provided evidence from which a reasonable jury could conclude that Erlanger retaliated against her for using FMLA leave.[10] [11]

---

[9] Plaintiff does not actually aver that Shears' girlfriend complained about Plaintiff not having to work in the Hybrid Room. Plaintiff only states that "some of the other surgical techs were apparently jealous" that she did not have to. (Doc. 23-1, at 5.)

[10] Erlanger also argues that Plaintiff's FMLA retaliation claim fails because transferring Plaintiff to the Main OR was not "materially adverse" and that it has presented a non-retaliatory reason for transferring Plaintiff to the Main OR. (Doc. 21, at 19–21.) Because the Court has found Plaintiff has not established a causal connection between her transfer and use of FMLA leave, the Court need not consider these arguments.

[11] It is unclear whether Plaintiff is bringing her retaliation claim under the FMLA, the ADA, or both. The complaint appears to allege both. (*See* Doc. 1-2, at 11 ("Defendant retaliated against Plaintiff . . . in violation of the Americans with Disabilities Act and the Family and Medical Leave Act.").) However, in her briefing, Plaintiff only points to facts which could support a finding of FMLA retaliation. (*See* Doc. 23, at 14–16.) To the extent that Plaintiff attempts to assert an ADA retaliation claim, she fails to point to facts in the record which would support an ADA retaliation claim. Summary judgment would therefore be appropriate.

## IV. CONCLUSION

For the reasons set forth above, Erlanger's motion for summary judgment (Doc. 20) will be **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's only remaining claim is her ADA failure-to-accommodate claim.

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**